**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **CONESTOGA TITLE** | : | **CIVIL ACTION** |
| **INSURANCE COMPANY** | : | |
| | : | **No. 10-CV-3017** |
| **v.** | : | |
| | : | |
| **ABM TITLE SERVICES, INC.** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ALAN MEROVITCH AND JAY YACKOW** | : | |

**CONESTOGA TITLE INSURANCE COMPANY'S**
**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

JOHN A. WAIT, ESQUIRE
Fox Rothschild LLP
100 Park Avenue @ East 40th Street
15th Floor
New York, NY 10017
(212) 878-7900

-and-

Edward J. Hayes, Esquire
Admitted *Pro Hac Vice*
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
(215) 299-2092

Attorneys for Plaintiff, Conestoga
Title Insurance Company

Dated: November 15, 2011

**TABLE OF CONTENTS**

I.     FACTS ................................................................................................................. 1

       A.     Introduction ............................................................................................. 1

       B.     The relationship between ABM and Conestoga ..................................... 1

       C.     The suspect transactions. ....................................................................... 2

              1.     The $550,000 loan transaction ..................................................... 3

              2.     The $320,000 loan transaction ..................................................... 6

       D.     Problems surface regarding the two loan transactions ........................... 6

       E.     The Agency Agreement is terminated and Conestoga pays policy limits to
              Holdings after efforts to validate the mortgage failed ........................... 7

II.    ISSUES ............................................................................................................... 7

III.   LEGAL ARGUMENT ........................................................................................ 8

       A.     The Summary Judgment Standard ........................................................... 8

       B.     ABM breached the Agency Agreement with Conestoga and was clearly
              negligent in its handling of the two loan transactions ........................... 10

       C.     Conestoga is entitled to recover the attorney's fees and costs  it incurred in
              this litigation based on the attorney's fee  provision contained in the
              Agency Agreement between the parties. ................................................ 17

IV.    CONCLUSION ................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

<small>**CASES**</small>

*Agency Rent a Car v. Grant Rent a Car,*
   98 F.3d 25 (2nd Cir. 1996) ....................................................................................................14

*Anderson v. Liberty Lobby Inc.,*
   477 U.S. 242 (1986) .......................................................................................................12, 13, 14

*B&M Linen Corp. v. Kannegiesser,*
   679 F.Supp.2d 474 (S.D.N.Y. 2010).........................................................................................21

*Brown v. Henderson,*
   257 F.3d 246 (2d Cir. 2001) ......................................................................................................13

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ............................................................................................................12, 13

*Ebanks v. New York City Dept. of Environmental Protection, No. 05-CV-3712,*
   2009 WL 891796 (E.D.N.Y. 2009) ...........................................................................................13

*Edinberg Volunteer Fire v. Danko Emergency,*
   55 A.D.3d 1108, 867 N.Y.S.2d 547 (2008).............................................................................17

*Hooper Associates v. AGS Computers,*
   74 N.Y.2d 487, 548 N.E.2d 903 (C.A.N.Y. 1989) ...................................................................21

*In re: Builders Capital and Services,*
   317 B.R. 603 (W.D.N.Y. 2004)..................................................................................................20

*Kaucher v. County of Bucks,*
   455 F.3d 418 (3rd Cir. 2006)....................................................................................................12

*Kerzer v. Kingly Mfg.,*
   156 F.3d 396 (2d Cir. 1998) ......................................................................................................13

*Lujan v. National Wildlife Fed'n,*
   497 U.S. 871 (1990) ...................................................................................................................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986) ...................................................................................................................13

*Meadows v. Planet Aid,*
   676 F.Supp.2d 83 (E.D.N.Y. 2009) ...........................................................................................14

*Mitsubishi Motor Credit of America, Inc. v. Country Motors LLC, No. 007-CV-3528,*
    *2008 WL 3200248 (E.D.N.Y. 2008)* ..........................................................................................13

*Morgan Stanley v. JP Morgan Chase,*
    *645 F.Supp.2d 248 (S.D.N.Y. 2009)* ........................................................................................14

*Property Advisory Group v. Bevona,*
    *718 F.Supp. 209 (S.D.N.Y 1989)* .............................................................................................17

*Siemionko v. Building Service 32B-J Ben. Funds, No. 07-CV-1548,*
    *2009 WL 3171955 (E.D.N.Y. 2009)* .........................................................................................13

*Stanford v. Kuwait Airways Corp.,*
    *89 F.3d 117 (2nd Cir. 1996)* .....................................................................................................15

## OTHER AUTHORITIES

*77 N.Y. JUR.2d Mortgages § 53 (2003)*........................................................................................20

*Fed. R. Civ. P. 56(a)* .....................................................................................................................12

*Fed. R. Civ. P. 56(e)* .....................................................................................................................13

Plaintiff, Conestoga Title Insurance Company ("Conestoga"), by its attorneys, John A. Wait and Edward J. Hayes, Esquires, hereby submits this Brief in support of its motion for summary judgment against Defendant, ABM Title Services, Inc. ("ABM").

## I.   FACTS

### A.   Introduction

This case involves an attempt by Conestoga to recoup losses it sustained directly as a result of the wrongful conduct of ABM in handling two loan transactions in 2006. In those transactions, mortgage documents were executed by Riccardo Tedesco ("Riccardo"), purportedly in his capacity as sole owner and officer of the borrower, 122 W.P.R. Corp. ("W.P.R."). ABM closed the transactions and allowed Riccardo to execute the loan documents without any independent investigation as to his authority to sign for and bind the corporation. In fact, Riccardo had no authority to act for W.P.R. as he was neither an owner nor officer of the company. At the time the transactions closed, ABM had substantial documents in its possession raising questions as to the authority of Riccardo to sign and rather than react affirmatively to those documents, ABM simply ignored them. Ultimately, the mortgages were declared void by the New York State Court and Conestoga was required to pay $870,000 to the lender under two policies of title insurance issued by ABM to the lender insuring the validity of those mortgages. ABM has no valid defenses to the claims asserted in this matter and summary judgment should be entered for Conestoga.

### B.   The relationship between ABM and Conestoga

Plaintiff is in the business of, inter alia, issuing commitments to insure and policies of title insurance in connection with real estate transactions. *Complaint ¶5.* Plaintiff transacts its business in the State of New York through policy issuing agents. *Complaint ¶6.* In 2003,

Alexander Meng ("Meng") made application to Conestoga for purposes of causing Conestoga to enter into an agency agreement with ABM. *January 18, 2011 deposition of Alexander Meng, pp. 23, 25 ("Meng deposition).*[1]  In his application, Meng indicated that he had either examined or read 15,000 titles as of the date of the application and that he handled approximately 2,500 real estate settlements as of that date. *Meng deposition, p. 28.*  In reliance upon the application, on October 24, 2003, Conestoga entered into an agency agreement (the "Agency Agreement") with ABM, whereby ABM was appointed as a non-exclusive policy issuing agent for Conestoga in New York. *Meng deposition, p. 35; January 14, 2011 deposition of William Parker, pp. 53-54 ("Parker deposition"); Parker deposition exhibit 2.*[2]  A review of the Agency Agreement discloses that:

> 1.    Pursuant to paragraph 4(b) of the Agreement, Defendant was required to process title applications in accordance with customary community procedures and recognized underwriting procedures in full compliance with Plaintiff's policies.
>
> 2.    Pursuant to paragraph 4(d) of the Agreement, Defendant was required to secure all appropriate evidence necessary before removing exceptions or objections in the title commitment.
>
> 3.    Pursuant to paragraph 4(f) of the Agreement, Defendant was required to exercise the highest degree of care in the examination of documents.
>
> 4.    Pursuant to paragraph 5 of the Agreement, Defendant was required to indemnify Plaintiff for all losses incurred by Plaintiff as a result of any negligence on the part of Defendant.

**C.    The suspect transactions.**

Meng received a telephone call from Riccardo indicating that a mortgage broker would be referring a transaction to ABM for handling. *Meng deposition, p. 61.*  Tedesco advised Meng

---

[1] A copy of the relevant portions of all depositions referred to herein are included in Volume I of the Appendix.

[2] A copy of the deposition exhibits referred to herein are included in Volume II of the Appendix.

that the transaction involved a loan and a mortgage at a strip mall. *Meng deposition, p. 62.* Tedesco advised Meng that the borrower in the transaction would be a corporate entity. *Meng deposition, p. 62.* The borrowing entity was identified as W.P.R. *Meng deposition, p. 66.*

Meng ordered a title search of the property which was the subject of the transaction through a search company, Hyper Abstract. *Meng deposition, p. 69-70.* This type of transaction was one where ABM would obtain from its title searcher copies of various documents in the chain of title, including copies of all mortgage, assignments, consolidations and modifications that went into the most recent consolidation of record on the Premises. *Meng deposition, p. 80.* Meng received and reviewed the results of the title search and his office prepared a title commitment for the loan transaction. *Meng deposition, pp. 72, 74.* The property involved in the transaction was located at 122-136 West Post Road, White Plains, NY (the "Premises") and the title commitment indicated that W.P.R. was the owner of Premises. *See title commitment, Meng exhibit 3.*

ER Holdings, LLC ("Holdings") was the lender in the transaction and Holdings agreed to make certain loans to W.P.R. provided it would obtain mortgage liens on the Premises to secure repayment of the loans. *Meng deposition, pp. 202-203.* Holdings also required as a condition of making the loans that it obtain policies of title insurance insuring against losses if the mortgage liens were not valid. *Meng deposition, pp. 202-203.* As of 2006, the Premises were already encumbered by an existing mortgage. *See title commitment, Meng deposition exhibit 3.*

### 1.    The $550,000 loan transaction

On February 13, 2006, Holdings loaned the sum of $550,000 to W.P.R. *Meng deposition, p. 94; Meng deposition exhibit 6.* To secure the repayment of the loan, a mortgage was given to Holdings, which mortgage was intended to be a second lien on the Premises. *Meng deposition, p. 94; Meng deposition exhibit 6.* The mortgage was executed by Riccardo at the

loan closing.  *Meng deposition, p. 94.*  What is important to note is that Meng was aware prior to closing that despite Riccardo's contention that he was always the owner of W.P.R., Riccardo's daughter, Lydia Tedesco ("Lydia"), had executed all of the recent financing documents in the chain of title to the Premises for W.P.R.  *Meng deposition, p. 98.*  In fact, at the time of closing on the loan, ABM had in its possession the following documents:

        a.  June 29, 1984 mortgage executed by W.P.R. in favor of Manufacturers Hanover Trust Company ("Manufacturers"), which mortgage was executed by Flavia Margotta, not Riccardo.  *Meng deposition, p. 91; Meng deposition exhibits 18, 19.*

        b.  August 4, 1988 mortgage executed by W.P.R. in favor of Dollar Dry Dock Bank ("Dollar"), which mortgage was executed by Riccardo.  *Meng deposition, p. 128; Meng deposition exhibit 21.*

        c.  August 4, 1988 agreement consolidating and modifying mortgage executed by W.P.R. in favor of Dollar, which agreement was executed by Riccardo.  *Meng deposition, p. 129; Meng deposition exhibit 22.*

        d.  January 1, 1995 modification and extension agreement executed by W.P.R. in favor of Emigrant Savings Bank ("Emigrant"), which modification was executed by Lydia, not by Riccardo.  *Meng deposition, p. 129-30; Meng deposition exhibit 23.*

        e.  UCC financing statement filed June 14, 2001, which statement was executed by Lydia, not by Riccardo.  *Meng deposition, p. 131-132; Meng deposition exhibit 25.*

f.  August 28, 2003 agreement of consolidation, extension and modification of mortgage executed by W.P.R. in favor of Emigrant, which modification was executed by Lydia, not by Riccardo. *Meng deposition, p. 135; Meng deposition exhibit 27.*

At the time of closing on the loan, the chain of title to the Premises did not reflect any mortgages or other financing type documents executed by Riccardo on behalf of W.P.R. after 1988. *Meng deposition, p. 136.* Since 1996, all documents in the chain of title to the Premises were executed by Lydia, not by Riccardo. *Parker deposition, p. 48.*

While Meng acknowledges that he was aware of all these documents and the fact that Riccardo had not executed them, Meng went forward with the closing and simply assumed that W.P.R. was a family owned corporation where if one family member was not available to attend a closing, someone else would sign who was available. *Meng deposition, pp. 99, 137.* Meng made this assumption without making any inquiry whatsoever of Lydia or W.P.R. *Meng deposition, p. 137.*

In addition to not reaching out to Lydia or anyone at W.P.R. regarding the authority of Riccardo to sign, ABM also admitted that it did not review the New York State Department of State website regarding W.P.R. *Meng deposition, p. 120.* At the time of closing, that website contained information indicating that Lydia was the chairman/chief executive officer of W.P.R. *Meng deposition, p. 121; Meng deposition exhibit 29.* This information was inconsistent with what Riccardo was telling Meng. Had Meng discovered the information on the website, he admitted he would have been more insistent upon getting proof of Riccardo's authorization to sign the mortgage documents. *Meng deposition, pp. 121-122.* Inexcusably, Meng did not take the two minutes necessary to perform this on-line search.

Despite failing to address these clear questions about Riccardo's authority, ABM issued Conestoga's policy of title insurance to Holdings insuring the lien of the $550,000 mortgage in second lien position on the Premises. *Meng deposition, p. 91; Meng deposition exhibit 5.* Meng understood that by issuing the policy of title insurance, ABM was insuring the validity of the mortgage. *Meng deposition, p. 92.*

### 2. The $320,000 loan transaction

Shortly after closing the $550,000 loan, Meng learned that W.P.R. was interested in borrowing additional monies from Holdings. *Meng deposition, p. 143.* In connection with the second loan, Meng ordered a continuation search of the previous title search from Hyper Abstract. *Meng deposition, pp. 145-146.* ABM prepared a title commitment in connection with the second financing. *Meng deposition, pp. 147-148; Meng deposition exhibit 31.*

On March 17, 2006, Holdings loaned the sum of $320,000 to W.P.R. *Meng deposition, p. 148.* To secure the repayment of the loan, a mortgage was given to Holdings, which mortgage was intended to be a third lien on the Premises. *Meng deposition, p. 152-153; Meng deposition exhibit 32.* As with the earlier $550,000 mortgage, the $320,000 mortgage was executed by Riccardo at the loan closing. *Meng deposition, p. 153; Meng deposition exhibit 32.* There is no evidence that any additional investigation was undertaken by ABM as to Riccardo's authority. In connection with this new loan, ABM issued Conestoga's policy of title insurance to Holdings insuring the $320,000 mortgage as a valid third lien on the Premises. *Meng deposition, p. 153-154; Meng deposition exhibit 33.*

### D. Problems surface regarding the two loan transactions

Holdings initiated an action in foreclosure against W.P.R. in the Supreme Court of the State of New York. In response to the foreclosure action, W.P.R. filed an Answer to the

Complaint in which it was alleged that Lydia was the sole owner and/or officer of W.P.R. and that Riccardo had no authority to act on behalf of W.P.R.  As a result of the defenses asserted by W.P.R., Holdings submitted a claim under the title insurance policies.  *Meng deposition, p. 186; Meng deposition exhibit 40; Parker deposition, p. 17.*  Conestoga retained counsel to represent Holdings in the foreclosure action in an effort to obtain a determination that the mortgages were valid.  *Parker deposition, p. 52.*

On October 24, 2008, the State Court determined that Riccardo had no authority to execute the mortgages, granted summary judgment in favor of W.P.R. and discharged the mortgages from the Premises.  An appeal was filed and by Decision and Order dated September 29, 2009, the Appellate Division affirmed the lower Court decision discharging the mortgages.  *Parker deposition, p. 113; Parker deposition exhibit 15.*  A request for reargument was denied.  *Parker deposition, p. 116; Parker deposition exhibit 16.*

### E.  The Agency Agreement is terminated and Conestoga pays policy limits to Holdings after efforts to validate the mortgage failed

Conestoga terminated the Agency Agreement by letter dated April 14, 2009.  *Meng deposition, p. 184; Meng deposition exhibit 39.*  Based on the fact that the mortgages had been declared invalid, Conestoga was obligated to, and did make payment in the sum of $870,000 to Holdings on February 22, 2010, representing the face value of the two title insurance policies issued by ABM.  *Parker deposition, p. 17, 85-86; Parker deposition exhibit 6.*  Conestoga seeks to recover that sum, plus accrued interest and all attorney's fees incurred by Conestoga in this action.

## II.  ISSUES

A.  Did ABM violate the Agency Agreement when it failed to properly ascertain if Riccardo was authorized to execute the mortgages on behalf of W.P.R., particularly when it had

records in its possession which showed that Riccardo had not executed any financing documents for W.P.R. since 1988?

B.      Did ABM violate custom and practice in the title industry when it completed closing on the two loans without making any independent investigation into the authority of Riccardo to act as an officer of W.P.R., particularly when it had records in its possession which showed that Riccardo had not executed any financing documents for W.P.R. since 1988?

C.      Was ABM negligent in the manner in which it conducted the two closings?

D.      Were the losses sustained by Conestoga caused by the wrongful conduct of ABM?

E.      Is Conestoga entitled to recover its attorney's fees in this case when the Agency Agreement provides for an award of such fees?


## III.    LEGAL ARGUMENT

### A.    The Summary Judgment Standard

There can be no question that summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" only if there is sufficient evidence with which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986); Kaucher v. County of Bucks, 455 F.3d 418, 423 (3rd Cir. 2006).* Furthermore, a factual dispute is only "material" if it might effect the outcome of the case. *Anderson., at 248.*

> The party seeking summary judgment always bears the initial responsibility of informing the District Court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).* Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id., at 325.* If this initial burden is met, then the non-moving party bears the burden of demonstrating that there are disputes of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).* Moreover, the non-moving party must produce evidence to support its position, and may not rest on conclusory allegations or bare assertions. *See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990).* The nonmoving party then must come forward with specific facts "to allow a reasonable juror to find in their favor." *Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001); see also Siemionko v. Building Service 32B-J Ben. Funds, No. 07-CV-1548, 2009 WL 3171955, 4 (E.D.N.Y. 2009).* Thus, "the nonmoving party…may not rely on conclusory allegations or unsubstantiated speculation." *Ebanks v. New York City Dept. of Environmental Protection, No. 05-CV-3712, 2009 WL 891796, 3 (E.D.N.Y. 2009)*(the nonmoving party "must offer concrete evidence from which a reasonable juror could return a verdict in his favor"); *see also Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)* (finding "[c]onclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact").

Moreover, "the party opposing summary judgment must do more than simply show that there is some metaphysical doubt as to the material facts." *Mitsubishi Motor Credit of America, Inc. v. Country Motors LLC, No. 007-CV-3528, 2008 WL 3200248, 2 (E.D.N.Y. 2008).* "Under Rule 56(e), the party opposing the motion 'may not rest upon the mere allegations or denials of his pleadings, but ... must set forth specific facts showing there is a genuine issue for trial.'" *Id. (quoting Anderson, 477 U.S. at 248).*

Although the district court must resolve any factual issues of controversy in favor of the nonmoving party, it must do so "only in the sense that, where the facts specifically averred by that [nonmoving] party contradict facts specifically averred by the [moving party]." *Lujan v. Nat'l Wildlife Federation et al., 497 U.S. 871, 888 (1990).* The function of the Court is not to weigh the evidence, but instead to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).* If there are no such issues, summary judgment is appropriate. *Id. At 251-252.*

It is respectfully suggested to this Court that there are no disputed material issues of fact in this case and that the law supports the grant of summary judgment in favor of Conestoga and against ABM.

## B. ABM breached the Agency Agreement with Conestoga and was clearly negligent in its handling of the two loan transactions.

In order to prove a breach of contract, Conestoga must establish "a contract between the parties and an act allegedly in violation of the agreement." *Agency Rent a Car v. Grant Rent a Car, 98 F.3d 25, 31 (2nd Cir. 1996).* The three elements of a breach of contract claim are "(1) the existence of a contract (2) breach of that contract, and (3) damages resulting from the breach." *Meadows v. Planet Aid, 676 F.Supp.2d 83, 95 (E.D.N.Y. 2009).* In this case, the uncontroverted evidence establishes that the Agency Agreement is the contract between the parties, that ABM breached that contract by failing to adhere to the standard of practice in the title industry and by failing to remove an unreasonable risk in the two transactions, and that the payment of the $870,000 resulted from ABM's breach of the Agency Agreement. As such, summary judgment is appropriate in this case and there is simply no defense to ABM's lack of due care in its handling of the two transactions.

Similarly, liability exists under the contract for negligent acts engaged in by ABM. *Agency Agreement,* ¶*5.*  In order to establish negligence under New York law, Conestoga must establish "the existence of a duty, the breach of which may be considered the proximate cause of the damages suffered by the injured party."  *Morgan Stanley v. JP Morgan Chase, 645 F.Supp.2d 248, 255 (S.D.N.Y. 2009).*  "In determining whether a duty exists, a court should examine: (1) the relationship between the parties; and (2) the reasonable foreseeability of harm to the person injured."  *Stanford v. Kuwait Airways Corp., 89 F.3d 117, 123 (2nd Cir. 1996).*  It is respectfully suggested that there is a duty running from ABM to Conestoga based on the relationship created by the Agency Agreement and that the harm suffered by Conestoga in this case was reasonably foreseeable when ABM closed the two loan transactions without conducting any meaningful investigation as to Riccardo's authority to act for W.P.R., in the face of serious questions as to his authority to do so.

A review of the facts of this case discloses that ABM failed to act in accordance with customary standards of practice for title agents, failed to secure all the documentation necessary to permit the two closings to proceed and failed to exercise the highest degree of care in the examination of documents in its possession at the time of the closings.  The wrongful conduct of ABM is easily seen when one reviews the documents which were in possession of ABM at the time the loan transactions closed.  ABM had various loan and financing documents in its possession which had been supplied by Hyper Abstract in connection with its title search of the Premises.  *See Meng deposition exhibits 18, 23, 25, 27.*  Despite ABM's alleged belief that Riccardo was and always had been the sole owner of W.P.R. and that he was authorized to execute the loan documents for W.P.R. (based solely on what Riccardo told ABM, not any independent investigation by ABM), the documents in the chain of title to the Premises

established that the last document signed by Riccardo on behalf of W.P.R. was in 1988, some eighteen years before the subject transactions. Those records also showed that since 1995, every single financing document in the chain of title was executed by Lydia, not by Riccardo. Meng admits ABM had these documents in its possession and also admits that he noticed, prior to the loan closing, that Lydia had executed all of these documents. Rather than heed the warnings arising from these documents and rather than conducting a full investigation into Riccardo's authority, Meng did nothing and instead closed the transaction simply because Riccardo executed a document affirming his authority to act for W.P.R. Questions about Riccardo's authority were addressed by simply having Riccardo certify he had authority to bind W.P.R. In essence, Meng allowed Riccardo to mortgage the Brooklyn Bridge based solely on Riccardo's statement that he owned the bridge and without any further investigation into the truth of that representation.

When confronted with this clear failure to act in the face of documents mandating an investigation, Meng stated that he was not concerned by the documents in the chain of title because he assumed this was a family run corporation in which whoever was available to attend a closing would sign documents for the company. This assumption was just that, an assumption, as Meng took no steps whatsoever to determine if this was a family corporation and whether his assumption was correct. He did not reach out to anyone at the company and did not reach out to Lydia, the signatory on the financing documents over the last ten years.

The fallacy of his assumption that this was a family business in which corporate offices were passed around is easily seen by a review of the documents in his possession, as the various loan documents do not show a corporation where corporate offices were passed around as needed. Instead, the public records included documents executed by Flavia Margotta in 1984,

then documents executed by Riccardo in 1988 and then all documents after that year were executed by Lydia. This is not a swapping of offices but instead shows a clear transfer of authority over a period of time. Clearly, the public records raised substantial questions as to any representations made by Riccardo that he was the sole owner and officer of W.P.R. and those records did not support an assumption that this was a corporation in which officers swapped titles to accommodate schedules. In the face of the questions raised by these publicly filed documents, ABM did nothing to determine the authority of Riccardo to bind W.P.R., other than requiring Riccardo himself to sign a document indicating he was authorized to sign. By failing to conduct any meaningful investigation, ABM breached the Agency Agreement and was negligent.

What makes this matter worse is that a two minute on-line computer check with the New York Department of State would have resulted in the discovery by ABM that it was Lydia, not Riccardo, who was listed as the chairman and chief executive officer of W.P.R. Meng acknowledges that had he known this information, he would have acted more carefully at the closing. *Meng deposition, pp. 121-122.* Without any explanation for its failure to do so, ABM made no inquiry of the New York Department of State and an $870,000 loss was cast upon Conestoga.

In dealing with Riccardo as the purported agent for W.P.R., ABM was obligated to "make the necessary effort to discover the true scope of [Riccardo's] authority." *Edinberg Volunteer Fire v. Danko Emergency, 55 A.D.3d 1108, 1110-1111, 867 N.Y.S.2d 547, 550 (2008).* "A party claiming reliance on an agent's apparent authority must not fail to heed warnings or inconsistent circumstances." *Property Advisory Group v. Bevona, 718 F.Supp. 209 (S.D.N.Y 1989).* In this case, ABM not only failed to heed the warnings and the inconsistent

circumstances shown by the publicly filed loan documents in its possession, but it chose to ignore them completely based on a unsupported assumption about the nature of W.P.R., thereby exposing Conestoga to a substantial risk in these transactions.

ABM attempts to defend its shoddy handling of the closings by contending that it had no duty to determine if Riccardo was authorized to sign documents on behalf of W.P.R. and that the obligation to do so rested solely with Holdings and its counsel. There is simply no support for such a statement and the statement is wholly inconsistent with the fact that a title insurance policy insures not only the priority of a mortgage on the subject property, but also the validity of that mortgage. A key issue in the validity of a mortgage is, obviously, the authority of the person signing that mortgage to bind the corporate borrower. Before committing its underwriter to insuring the validity of a mortgage, a title agent is obligated to take reasonable actions to insure that the person signing the mortgage documents is authorized to do so. Without such authority, the mortgage is invalid. ABM took no such reasonable actions in this case.

In addition to just the common sense recognition that what ABM did in this case was wrong, Conestoga provided two expert reports to counsel for ABM by the February 2011 deadline set forth in this Court's scheduling Order.[3] Those reports, authored by Dennis DeAngelis, an attorney involved in the title industry since 1992 and the owner of a title insurance agency in New York, and Felice Shapiro, an attorney involved in the title industry since 1983 and currently the Executive Director of the Title Insurance Rate Association, confirm that ABM failed to fulfill its obligations to Conestoga in the closing of the two loan transactions.

After reviewing the facts of this case, Mr. DeAngelis opined that a title agent in New York has a duty to its underwriter to confirm that an individual appearing at closing has the

---

[3] Copies of the reports are included in the Appendix to the Motion for Summary Judgment.

authority to act for a corporate borrower and further stated that, contrary to ABM's position, the capacity of the party to execute documents is an essential part of every closing. ***DeAngelis report, p. 2.***   Mr. DeAngelis stated that Meng's reliance on self-serving statements made by Riccardo that he was authorized to execute the loan documents was not sufficient to establish Riccardo's authority to act, particularly in light of the red flags which existed in this case. ***DeAngelis report, p. 3.***   After setting forth his analysis, Mr. DeAngelis' concluded that:

> ABM as agent for Conestoga had a duty to make sure that the mortgages that it insured were valid liens on the property that was the subject of the underlying transactions herein. ABM breached that duty and was negligent in insuring title by reason of the following: failing to obtain proper proof that the person appearing at the closing was authorized to act for the corporation, ignoring evidence in the public record that raised a question as to who was authorized to act for the corporation, failing to check the NYS DOS website for this corporation and by relying on others to make the determination as to who was authorized to act for the corporation.
>
> By insuring these transaction under the circumstances outlined herein ABM did not follow or adhere to acceptable, recognized or common title insurance practices.

***DeAngelis report, p. 4.***

As to ABM's argument that it had no duty to confirm the authority of Riccardo to sign and that it was entitled to rely on the due diligence of Holdings as to the issue of Riccardo's capacity, Ms. Shapiro disagreed. Ms. Shapiro indicated in her report that "in the State of New York, the role of the title agent and the role of the lender's counsel are two distinct and different roles, both prior to the closing and at the closing table. The duties and obligations of the title agent cannot be delegated to the lender's counsel. The title closer at the closing table is representing the title agent and its underwriter and is responsible for protecting their interests pursuant to the agency agreement between the agent and the underwriter." ***Shapiro report, p. 4.***

Ms. Shapiro went on to disagree with ABM's contention that it had no duty to confirm the authority of Riccardo to sign documents.  Instead, Ms. Shapiro indicated that:

> The issue of the authority of the person executing a document on behalf of a borrower relates directly to the validity of the mortgage and is a critical issue in any title insurance transaction….An agent must focus not only on the title issues appearing in the public records so as to confirm the 'priority' of an insured mortgage, but must also verify the authority of the party executing the mortgage so as to address the 'validity' of the mortgage.

**Shapiro  report, p. 5.**  There can be no question that in order for a mortgage to be valid, the person signing the document needs to have authority to bind the borrower to the mortgage transaction. **In re: Builders Capital and Services, 317 B.R. 603, 608 (W.D.N.Y. 2004), citing 77 N.Y. JUR.2d Mortgages § 53 (2003).**  Obviously, if the underlying mortgage is invalid because of lack of authority to sign, the priority of that mortgage becomes a non-issue.  Despite all of his years of experience, Meng simply did not seem to comprehend the importance of insuring the validity of the underlying mortgage documents.  In fact, Meng admitted in his deposition in the underlying foreclosure matter that he focused on the chain of title issues, not the ownership of W.P.R. **May 15, 2008 deposition of Alexander Meng, p. 48.**  In light of his experience, this failure to comprehend was inexcusable.

As to ABM's attempts to justify its lack of due diligence by pointing out that Riccardo signed a corporate resolution permitting the mortgage of the Premises, Ms. Shapiro indicated that such reliance was unreasonable.  As stated by Ms. Shapiro in her report:

> In this case [ABM] clearly failed to identify a potential risk and clearly failed to eliminate the risk, all apparently based on the unfounded assumption that this was simply a family corporation with 'passed around' corporate offices.  The mere acceptance of the executed "Certificate of Directors Resolution to Mortgage Corporate Property" at the closing by the title closer did not eliminate the risk due to the other acts that were known to the agent.

*Shapiro report, p.5.*

It is respectfully suggested to this Court that common sense itself, and the opinions of the experts produced by Conestoga, make it clear that ABM failed to act properly at the closings when it insured the two loan transactions in the face of the clear risk that Riccardo may not have had authority to act on behalf of W.P.R.  By doing so, ABM breached the Agency Agreement and breached its duty to Conestoga, putting Conestoga in the position where it was exposed to a foreseeable $870,000 loss in the event it was determined that the mortgages were invalid due to Riccardo's lack of authority.  In fact, that very loss occurred when the State Court determined that Riccardo had no authority to act and that the mortgages were invalid, striking them from the Premises.  Once that determination was made and the mortgages stricken, Holdings suffered a complete loss under the two title policies and Conestoga was obligated to pay the face amounts of the policies to Holdings.

As there are no disputed issues of material fact as to the failure of ABM to act properly, summary judgment should be entered in favor of Conestoga and against ABM and damages should be assessed in the sum of $870,000, plus accrued interest from February 22, 2010 to the date of payment.

> **C.     Conestoga is entitled to recover the attorney's fees and costs it incurred in this litigation based on the attorney's fee provision contained in the Agency Agreement between the parties.**

In addition to recovering the monies paid to Holdings, Conestoga also seeks to recover the attorney's fees and costs incurred in this matter.  While the general rule is that attorney's fees are not recoverable under New York law, such fees are recoverable when there is an agreement between the parties providing for the award of fees.  *Hooper Associates v. AGS Computers, 74 N.Y.2d 487, 491, 548 N.E.2d 903 (C.A.N.Y. 1989); B&M Linen Corp. v. Kannegiesser, 679*

*F.Supp.2d 474, 485 (S.D.N.Y. 2010).* "It is not uncommon for parties to a contract to include a promise by one party to hold the other harmless for a particular loss or damage and counsel fees are but another form of damage which may be indemnified in this way." *Hooper, supra, 74 N.Y.2d at 491.*

A review of the Agency Agreement shows that such an agreement to indemnify for attorney's fees exists between the parties. Paragraph 5 of the Agency Agreement provides that "[ABM] agrees to be solely liability and indemnify Conestoga for all attorney's fees, court costs, expenses and loss or aggregate of losses resulting from shortages in its escrow accounts, fraud, negligence or misconduct of its agents, its officers, or employees in the issuance of title insurance." *Agency Agreement, p. 4, ¶5.* Assuming this Court finds that ABM has liability to Conestoga for the $870,000 loss, this provision of the Agency Agreement provides the authority necessary for the award of attorney's fees and costs in this matter. It is respectfully requested that this Court grant summary judgment and declare that Conestoga is also entitled to recover its reasonable attorney's fees and costs incurred in this matter, the amount of which will be assessed at a later date.

## IV.   CONCLUSION

For the reasons set forth herein, it is respectfully requested that this Court award summary judgment in favor of Conestoga and against ABM as there are no material issues of fact in dispute and as the law supports Conestoga's request that it be indemnified for the losses it sustained due to the wrongful conduct of ABM. ABM has no basis to defend its failure to take reasonable action to verify the authority of Riccardo to execute documents and bind W.P.R., particularly in the face of information in its possession which raised serious questions as to Riccardo's authority. It is requested that the Court award Conestoga the sum of $870,000, plus

interest from February 22, 2010 and that the Court also award Conestoga the attorney's fees and

costs incurred in this litigation based on authority provided in the Agency Agreement.

Respectfully submitted,


/s/John A. Wait, Esquire
JOHN A. WAIT, ESQUIRE
Fox Rothschild  LLP
100 Park Avenue @ East 40th Street
15th Floor
New York, NY 10017
(212) 878-7900

-and-

Edward J. Hayes, Esquire
Admitted *Pro Hac Vice*
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
(215) 299-2092

Attorneys for Plaintiff,
Conestoga Title Insurance Company

Dated:  November 15, 2011